### THOMAS et al. v. LANCASTER MILLS, OF CLINTON, MASS.

(Circuit Court of Appeals, Seventh Circuit. January 6, 1896.)

#### No. 214.

1. LIABILITY OF CARRIER—DELAY IN TRANSPORTATION.

The fact that the destruction of a shipment by fire occurred during a negligent delay on the part of carrier in forwarding it, does not render such delay the proximate cause of the loss.

2. SAME—STIPULATION AGAINST LIABILITY.

A common carrier cannot by stipulation exempt itself from liability for loss occasioned by its own negligence.

3. SAME.

A stipulation exempting the carrier from liability for loss while the property is in transit, or at places of transshipment, does not relieve the carrier from liability for loss occasioned by its negligent exposure, during a delay in transportation, to dangers that ordinary foresight should have guarded against.

4. SAME—FIRE AT PLACE OF TRANSSHIPMENT.

A railway company received a quantity of cotton for transportation, and had it placed on barges for carriage to another city, to be placed on its cars. By direction of the company the barges were detained a mile or two below the proper place for the delivery of freight to the company and at a point where there was such a large amount of shipping as to necessitate the mooring of the barges much nearer the channel of the river and passing steamers than would have been necessary at any point in that neighborhood. The prevailing winds at that season blew from passing steamers toward the barges, and on the bank near by trains were constantly running. After the barges had been so moored for 17 days, the cotton caught fire from a passing steamer. *Held,* that the company was negligent in placing the cotton in such an exposed position.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

This was an action by the Lancaster Mills, of Clinton, Mass., for the use of the Insurance Company of North America, against Anthony J. Thomas and Charles E. Tracy, receivers of the Cairo Division of the Wabash, St. Louis & Pacific Railway Company. From a judgment in favor of plaintiff (63 Fed. 200), defendants appeal. Affirmed.

The Cairo Division of the Wabash, St. Louis & Pacific Railway, extending from Cairo, Ill., to Tilton, Ill. (hereinafter termed the railway company), was,

from and after the 22d day of April, 1885, operated by the appellants as re-
ceivers, under appointment by the circuit court of the United States for the
Southern district of Illinois, in a suit brought in that court for the foreclosure
of a mortgage upon that division of the railroad. In the course of such
operation the receivers employed an agent at Memphis, Tenn., to secure ship-
ments of property for transportation over the line, of railway in question.
Such agent had authority to employ steamboat and barge lines to transport
cotton from Memphis and other points on the Mississippi river to Cairo, under
bills of lading issued by him as such agent, contracting for transportation
from the point of shipment to the final destination at the mills or factories in
the East. He also had authority to contract for the shipment of cotton from
Memphis to its final destination at the East by all-rail transportation. In
November and in the early days of December, 1886, the corporation, Lancas-
ter Mills, purchased, through William Bowles & Sons, of Memphis, Tenn., one
thousand bales of cotton, which were delivered to the agent of the receivers
for shipment to Clinton, Mass., and for which the agent gave through bills of
lading to William Bowles & Sons. The several bills of lading were of like
tenor and effect, and acknowledged the receipt in apparent good order of the
bales of cotton referred to, marked "L. T. 1/300/B/c. To order. Clinton,
Mass. Notify Lancaster Mills. River to Cairo. From Memphis to Clinton,
Mass. Cotton. Per 100 pounds, 58c." The bill of lading recites that the
packages are to be transported by the railway company in question, and for-
warding lines with which it connects, until the said goods and merchandise
shall have reached the point named in the contract, upon certain terms
and conditions stated. The only condition necessary to be noticed here is
that the railway company and forwarding lines shall not be liable for
"loss or damage to any article or property whatever by fire or other casualty
while in transit, or while in depots, or other places of transshipment, or at
depots or landings at points of delivery, nor for loss or damage by fire,
collision, or the dangers of navigation, while on the seas, rivers, lakes, or
canals." Seven hundred bales of the cotton mentioned were loaded at
Memphis under shipping instructions given by the agent of the railway
upon Barge 49 between December 2d and December 9th, and constituted
part of 2,072 bales of cotton, the cargo of the barge. The bill of lading
issued by the owners of the barge affirmed that they were shipped by the
agent of the railway company, to be delivered without delay (the dangers
of navigation, fire, explosion, and collision excepted), at the port of Cairo,
Ill., to the railway company or assigns. This barge was in all respects a
carrier of the first class, well manned and carefully constructed to guard
against fire, as were also the steamboat and the other barges, which pro-
ceeded together. The steamboat R. S. Hayes, with five barges in tow, in-
cluding Barge 49, arrived at the port of Cairo at midnight, between the 10th
and 11th days of December, occupying in transit the usual, time of about
48 hours, and tied up, with the barges in tow, at the public levee at the
foot of Tenth street. The usual place for the receipt of cotton by the
railway company was at North Cairo, a mile and a half up the Ohio river
from the city of Cairo. There was dispute whether the Hayes tied up at
Cairo and did not proceed to North Cairo on account of ice in the river,
or because of orders of the railway company. The steamer, with her barges,
remained at Cairo until the 28th day of December, when the steamer caught
fire, which was communicated to Barge 49, and the cargo of cotton de-
stroyed. There was also dispute whether this delay of 17 days was caused
by the refusal of the railway company to take the cotton, owing to the con-
gestion of cotton freight at that time, or because of ice in the river. There
was also evidence proving that certain sums of money were paid by the
agent of the railway company at Memphis to the shippers, and it was in
dispute whether such payments were as rebate in freight rates, or for as-
sumption of the marine risk upon the cotton between Memphis and Cairo.
The Lancaster Mills had insured this cotton with the Insurance Company
of North America. On June 2, 1887, the Lancaster Mills filed in the court be-
low its intervening petition, in its own behalf, and for its own use and
benefit, seeking to recover the amount of the loss. In May, 1892, after
payment to it by the insurance company of the amount of the loss, it filed

its amended intervening petition, for the use of the insurance company, in which it is alleged as ground for recovery "that the loss of the cotton by said fire was the result of carelessness and negligence and delay of said receivers of said Cairo, Vincennes, and Chicago lines, while the said cotton was in their possession in course of transportation, in pursuance of the contract of transportation aforesaid." The answer alleged, with other defenses not necessary to be stated, that the destruction of the cotton was without negligence or carelessness upon the part of the receivers; that it was not then in the custody or under the control of the receivers, but was in the custody and under the control of the Mississippi Valley Transportation Company, the owner of the steamboat and barges, and was in transit by said company's line. and claimed exemption under the conditions in the bill of lading referred to. On the 1st day of November, 1894, the court below decreed in favor of the petitioners that the receivers of the railway company pay to the Insurance Company of North America the sum of $47,468.30, the value of the cotton destroyed; from which decree this appeal is taken.

John M. Butler, for appellants.

John F. Lewis, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

JENKINS, Circuit Judge, after stating the facts, delivered the opinion of the court.

We do not find it needful to determine the disputed question of fact whether the sums paid to the shippers by the agent of the railway company were in rebate of freight, or in consideration of the assumption by the shippers of the marine risk between Memphis and Cairo, nor to say whether the receipts given by the shippers upon such payments were altered after delivery, or were procured by fraudulent means, since our judgment must proceed upon other facts which are undisputed, or abundantly established by the evidence. Nor do we need to consider the interesting question discussed at the bar, whether, under the act of March 27, 1874 (Rev. St. Ill. 1881, c. 27, § 1), that "whenever any property is received by a common carrier to be transported from one place to another within or without this state, it shall not be lawful for such carrier to limit his common law liability safely to deliver such property at the place to which the same is to be transported, by any stipulation or limitation expressed in the receipt given for such property," it was competent for the railway company by contract to relieve itself of its common-law liability. It was urged that this statutory provision is to be read into the charter of the company, and is the law of its existence, that its charter is the same abroad as at home, and that this company carried with it into Tennessee this disability to limit its liability.

We assume for the purpose of this case—without passing any opinion upon the question—that the railway company, contracting in the state of Tennessee, could thus limit its common-law liability, notwithstanding the statute. Upon the postulate that the railway company could thus relieve itself of the marine risk between Memphis and Cairo, and upon the further postulate that that risk was assumed for a consideration by the shippers, the cotton

was received by the railway company at Memphis, and shipped by river under a through bill of lading for transportation to Clinton, in the state of Massachusetts, over the line of the railway company and its connections, subject to the condition contained in the bill of lading that the railway company and forwarding lines connected therewith should not be liable for loss or damage by fire or other casualty, while in transit, or while in depots or other places of transshipment, or at depots or landings at points of delivery, nor for loss or damage by fire, collision, or the dangers of navigation, while on the seas, rivers, lakes, or canals. The cotton was, as to its shippers and owners, delivered into the possession of the railway company at Memphis, which employed the River Transportation Company to take it from Memphis and deliver it to the railway company at North Cairo; but it was so in its possession subject to the assumption of the marine risk by the shippers and owners. It arrived at Cairo at midnight between the 10th and 11th days of December, and was not delivered at North Cairo because the agents of the railway company directed its detention at Cairo. We are satisfied that its enforced delay there for 17 days was caused, not by the ice in the river, but by the railway company for its own purposes. It is unnecessary to review the evidence. It is sufficient to say that the testimony establishes to our satisfaction that there was a glut of freight beyond the capacity of the railway company to handle with ordinary dispatch, that the railway company at Memphis contracted to carry this cotton during the period of and with knowledge of its inability to handle it with proper dispatch, and that the detention from the 11th to the 28th of December must be attributed as a fault to the railway company. This conclusion is supported by the fact that, during such detention, the railway company agreed with the River Transportation Company to a stipulated demurrage for the detention of the barges after 48 hours from their arrival, thus recognizing that the delay was for its convenience and for its own purposes. This delay, however, was not, of itself, a proximate cause of the destruction of the cotton by fire. The loss would have occurred if the barge had arrived at Cairo on the evening of the 28th of December, immediately prior to the fire, and had been moored at the place it occupied. The negligent delay was, standing alone, a remote, and not a proximate, cause, remotely contributing to the injury as an occasion or condition. Railway Co. v. Reeves, 10 Wall. 176; St. Louis, I. M. & S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 233, 11 Sup. Ct. 554; Hoadley v. Northern Transp. Co., 115 Mass. 304; Morrison v. Davis, 20 Pa. St. 171; Goodlander Mill Co. v. Standard Oil Co., 24 U. S. App. 7, 11 C. C. A. 253, 63 Fed. 400. So that if the negligent delay was the only fault attributable to the company, it may be doubted whether under the conditions of the bill of lading limiting liability, there could be a recovery, because such delay did not of itself produce the loss, there being no causal connection between the negligent act and the injury. For reasons of public policy a common carrier is not permitted, even by express stipulation, to exempt itself from loss oc-

casioned by its own negligence. Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 322, 6 Sup. Ct. 750, 1176; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 441, 9 Sup. Ct. 469; California Ins. Co. v. Union Compress Co., 133 U. S. 387, 415, 10 Sup. Ct. 365; Constable v. National Steamship Co., 154 U. S. 51, 62, 14 Sup. Ct. 1062.

The question, therefore, is presented whether the railway company, in connection with or independently of its negligent delay, was guilty of any act of negligence which may be deemed an active, efficient, and availing cause of the destruction of this cotton. For, although the immediate cause of the loss was doubtless fire from the sparks of a passing steamer, yet if the negligence of the railway company concurred or mingled with the immediate cause as an active and sufficiently proximate cause of the loss, the carrier is not absolved from responsibility, notwithstanding the stipulated exemption. And this is so, we take it, because the shipper stipulated the exemption from liability upon the part of the carrier with respect to dangers attending the property in the usual course of its carriage. They agreed to exempt the carrier from liability for loss or injury by fire or other casualty while the property was in transit, or while in depots or other places of transshipment, or at depots or landings at points of delivery, and from marine risks while on the seas, rivers, lakes, or canals. The exemption contemplates a continuous carriage according to the usual course of business, and the dangers incident to such carriage. It, doubtless, comprehended such usual delays as attended transportation in the ordinary dispatch of business. It may be doubted if the exemption included dangers incident to suspended transportation at the mere election of the carrier. It certainly did not contemplate that the carrier, during such suspended transportation, might negligently expose the cotton to dangers that ordinary forecast should have guarded against. In case of delay by the carrier, he is bound to protect the property in his charge from unreasonable hazards. He is bound to guard it from dangers which ought reasonably to be apprehended. If he fails therein, and especially if he unnecessarily exposes property to apprehended danger, he is liable, notwithstanding the exemption of the bill of lading, and although his act may not be the immediate cause, but the concurring cause, of the loss. There is no certain agreement in the cases in respect to the ground upon which the rule is based. Some assert the negligent act of exposure to be a proximate or concurring cause of the loss. Others, disregarding any question of remote, concurring, and proximate cause, place the rule upon the ground that the carrier shall not be permitted to avail himself of exemption from liability when his own act has exposed the property unnecessarily to danger that should reasonably have been anticipated. The latter ground seems to us the more logical and comprehensive, avoiding all nice distinction with respect to remote, concurring, or proximate cause. It places liability upon the ground that the character of insurer attaches to the contract of carriage, and that the exemption from liability con-

tracted for is inoperative in case the negligence by the carrier concurs with other causes to produce the loss; or, in other words, that the exemption contracted for was from loss occasioned by the dangers naturally incident to the carriage, and not from those which were brought about by the carrier's negligence, that the latter are not within the intendment of the exemption, and therefore that the carrier stands as insurer under his common-law liability, not discharged, with respect to losses occasioned by his own negligence, by any exemption in the contract of carriage. The rule, however, upon whatever ground it may be placed, is well settled. Williams v. Grant, 1 Conn. 487, 492; Tierney v. Railway Co., 76 N. Y. 306; Tanner v. Railroad Co., 108 N. Y. 623, 15 N. E. 379; Scott v. Hunter, 46 Pa. St. 195; Derry v. Flitner, 118 Mass. 133; McGrew v. Stone, 53 Pa. St. 436; Canal Co. v. Tiers, 24 N. J. Law, 697; McGraw v. Railroad Co., 18 W. Va. 361; Wolf v. American Exp. Co., 43 Mo. 421; Hewett v. Railway Co., 63 Iowa, 612, 19 N. W. 790; Fent v. Railroad Co., 59 Ill. 349; Railroad Co. v. Hoag, 90 Ill. 339.

We find no difficulty in reaching the conclusion that the railway company, during the period of negligent delay, wrongfully and negligently exposed this cotton to danger. The Ohio river, at Cairo, was the seat of an active commerce. The cotton should have been delivered to and received by the railway company at North Cairo, a place for the exclusive delivery of freight consigned to the railway company. By direction of the company the barge containing this cotton was detained at Cairo, a mile or two below the place of delivery, at the foot of the levee at Tenth street. This was a public landing, at the foot of a steep bank. At the top of the bank are laid the tracks of the Illinois Central Railroad, over which there is a constant passage of trains. There was at this time an unusual number of vessels at this levee, where at all times a greater number of vessels are moored than at any other point at Cairo. The main channel of the Ohio river is at this point closer to the shore than at any other point in the vicinity, so that passing steamers here come closer to the shipping than at other points, and especially so than at North Cairo, where the barge should properly have been moored. The congestion of shipping at this levee had the effect to place the barge further out in the river than ordinarily would have been the case, and so closer to passing steamers. The prevailing winds at this season of the year are from the south. This being the condition of things, the barge was knowingly placed in the most exposed situation possible at Cairo. If it was designed to expose this property to destruction, no better place for that purpose could have been selected. On the one side it was exposed to sparks from passing trains upon the Illinois Central Railroad. Upon the other it was exposed to sparks from passing steamers, which here come closer to the shore than at any other point upon the river at that place. By reason of the congestion of the shipping there, this barge and its attendant steamer were moored far out in the river, and quite close to the channel, thus subjecting them to greater danger from sparks from the nu-

merous passing steamers. This cotton, as is well known, is a highly inflammable material. The railway company refrain from handling it in the night time, to avoid exposing it to the possible danger to fire from torch or lantern. As one of the witnesses for the railway company expresses it, "It is liable to take fire almost like tinder."

The railway company was bound to deal with this property with a care proportionate to the risk. Being inflammable, the cargo should be zealously guarded against exposure to fire. Here, the barge was moored, not at the proper place, but in a place where it would be most exposed to danger, and to the very danger by which its destruction was accomplished, and which the most ordinary circumspection should have apprehended. And this was done, not out of necessity, arising in the transit of the cotton, but for the accommodation of the company during the period of its negligent delay in transit. We cannot but think, under the circumstances here disclosed, that this property was negligently exposed by the railway company, and that it cannot, therefore, avail itself of the exemptions of the bill of lading, because such dangers were not within the contemplation of the stipulated exemptions.

The decree will be affirmed.

WOODS, Circuit Judge, sat upon the hearing of this cause, but, for personal reasons occurring subsequently to the hearing, did not participate in the decision.